UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| NORA MITCHELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5: 20-157-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ETHICON INC., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiffs Nora and Arthur Mitchell claim they were harmed as a result of Nora's implantation with a TVT-Secur ("TVT-S"), a pelvic mesh product used to treat stress urinary incontinence. The device allegedly was manufactured by the defendants. The defendants have filed a motion for partial summary judgment, which will be granted because the plaintiffs have failed to produce evidence from which a jury could conclude that the defendants' warning was inadequate or that an inadequate warning caused the plaintiffs' alleged harm. The defendants also have filed a motion to dismiss the Amended Complaint, which will be denied, as moot.

## I.      Procedural History

This matter recently was transferred from multidistrict litigation ("MDL") in the United States District Court for the Southern District of West Virginia.  *In re Ethicon, Inc., Pelvic Repair Systems Products Liability Litigation*, 2: 12-md-2327.  The MDL involves claims of harm resulting from implantation with various polypropylene-based mesh products, including TVT-S.

Judge Joseph Goodwin presided over the MDL, which began in 2012.  Numerous cases were filed directly in the Southern District of West Virginia and many were transferred from other jurisdictions.  On August 22, 2012, Judge Goodwin entered Pretrial Order Number 12, which included a plan for streamlining the pleading process.  A 63-page Master Long-Form Complaint was filed, which was described an "administrative device to set forth potential claims individual Plaintiffs may assert against Defendants" in the litigation.  [S.D. W.Va. 2: 12-md-2327, Record No. 220]  A draft Short-Form Complaint also was filed, which was a template individual plaintiffs would complete to set out their individual allegations and to indicate which counts of the Master Complaint they intended to assert against one or more pelvic mesh producers.  *Id.* at Record No. 219.

Plaintiffs Nora and Arthur Mitchell filed their Short-Form Complaint on June 22, 2015. [S.D. W.Va. 2: 15-cv-8094]  Nora alleged that she had been implanted with the defendants' TVT-S product on December 6, 2010, in Lexington, Kentucky.  She indicated that she wished to proceed against the defendants on all counts raised in the Master Complaint, which include: negligence (count I); strict liability—manufacturing defect (count II); strict liability—failure to warn (count III); strict liability—defective product (count IV); strict liability—design defect (count V); common law fraud (count VI); fraudulent concealment (count VII); constructive fraud (count VIII); negligent misrepresentation (count IX); negligent infliction of emotional distress (count X); breach of express warranty (count XI); breach of implied warranty (count XII); violation of consumer protection laws (count XIII); gross negligence (count XIV); unjust enrichment (count XV); loss of consortium (count XVI); punitive damages (count XVII); and discovery rule and tolling (count XVIII).

The plaintiffs' case was placed in "Wave 8" of the MDL.  [S.D. W.Va. 2: 12-md-2327, Record No. 5235]  The court entered Pretrial Order 280 on January 30, 2018, which included deadlines for completing discovery and filing dispositive and *Daubert* motions.  *Id.*  Discovery closed in September 2018 and dispositive and *Daubert* motions were due shortly thereafter pursuant to the Order.  The parties were instructed to file dispositive and *Daubert* motions (with the exception of *Daubert* motions regarding general causation) in the applicable member cases—not in the Ethicon MDL.

The defendants filed a motion for partial summary judgment in October 2018, which remains pending.  [Record No. 17]  Judge Goodwin elected to transfer the case to this Court in April 2020, noting that discovery was complete and the time to file dispositive motions had expired.  He recommended that the case be set for trial without reopening discovery, as doing so was "completely unnecessary" and would "result in unjust delay."  [Record No. 25]

Upon transfer, this Court reviewed the plaintiffs' Short-Form Complaint, as well as the Amended Master Long-Form Complaint, and observed that the plaintiffs had not alleged facts sufficient to establish by a preponderance of the evidence that federal subject matter jurisdiction exists.  While the Court did not have serious doubts that diversity jurisdiction is present, it has an obligation to ensure that it has subject matter jurisdiction over any case before it.  Accordingly, the plaintiffs were permitted to file an Amended Complaint to correct the jurisdictional allegations.  In so doing, the plaintiffs resubmitted their Short Form Complaint, but corrected the factual allegations concerning the parties' citizenship and the amount in controversy.  [Record No. 63]

The parties tendered a Joint Status Report in May 2020, indicating that the MDL Court did not decide all challenges raised within the parties' *Daubert* motions and that it expressly

- 3 -

reserved some determinations for the trial court.  [Record No. 57]  However, the parties did not identify the particular *Daubert* issues that remain unresolved and agreed that the defendants' motion for partial summary judgment should be immediately submitted to the Court for resolution.

## II.    Factual Background

Plaintiff Nora Mitchell ("Nora") saw Clarissa Beiting, M.D., a board-certified obstetrician/gynecologist, for the first time on October 29, 2010.  She complained of urinary incontinence when coughing, sneezing and laughing; vaginal/pelvic pressure; and "tissue falling through the vaginal opening."  [Beiting Deposition, Record No. 17-1, pp. 18-19] Beiting performed a pelvic examination and concluded that Nora's bladder had prolapsed through the anterior wall of her vagina and that her rectum had prolapsed through the posterior wall of her vagina, to a lesser degree.  *Id.* at p. 19.  Beiting also noted that Nora's urethra was hypermobile.  Beiting and Nora discussed surgical repair of these problems, the alternatives, and some of the risks involved, including urinary retention, bladder complications, urinary tract infections, mesh erosion, incontinence, and future prolapse with surgery needed for repair.  *Id.*

Nora returned to Beiting's office on November 11, 2010.  That day, Beiting performed tests that confirmed the diagnosis of stress urinary incontinence ("SUI").  *Id.* at p. 20.  Beiting explained that SUI is a condition in which patients lose support in the urethral plane with age or after childbirth, causing leakage of urine with activities such as coughing, sneezing, or laughing.  *Id.* at p. 14.  Beiting examined Nora again during that visit and staged her anterior vaginal prolapse as "third degree midline."  She advised that the posterior prolapse "didn't

seem very large," but told Nora that she could assess it at the time of surgery and repair it if necessary. *Id.* at p. 20.

Seventy-one-year-old Nora elected to undergo surgery, which Beiting performed on December 6, 2010. [Record No. 19-2, p. 2] Correction of the anterior and posterior vaginal prolapses took about one hour. Although the operative report does not specify the length of the incisions, Beiting testified that the incisions for these procedures typically are four to five centimeters long. [Record No. 17-1 at p. 22] Beiting used TVT-S or "mini sling" to treat the SUI. She explained that TVT is synthetic tape which is implanted between the vaginal wall and the urethra to provide urethral support to those suffering from SUI. *Id.* at p. 15. Once implanted, the tape limits urethral mobility so that urine does not leak upon stress provocation such as coughing, sneezing, or exercising. *Id.* That portion of the surgery required a one-and-one-half-centimeter-long incision and lasted about one-half hour.

Nora had an unremarkable post-operative check-up on December 17, 2010. *Id.* at p. 23. During her next visit, on January 3, 2011, Beiting diagnosed her with a superficial vaginal infection and prescribed an antibiotic. Beiting observed normal post-operative healing, but prescribed estrogen cream as a supplement to aid "comfort and function of the vaginal cavity." *Id.* at p. 23. When Nora returned in March 2011, the physician's assistant who evaluated her noted that she was using the estrogen cream inconsistently. *Id.* Nora did not return to Beiting's office after that visit.

The plaintiffs filed suit on June 22, 2015, alleging that they had been harmed by Nora's implantation with the TVT-S. As required under the MDL discovery schedule, Nora completed a "Plaintiff Fact Sheet" on an unknown date. She indicates that the TVT-S mesh "eroded/extruded" out of her body in small pieces over an unidentified period of time. [Record

No. 19-4, p. 3]  Nora reports that, as a result of her implantation of the TVT-S, she has experienced "discomfort, urinary problems/increased frequency, painful urination, dyspareunia,[1] vaginal scarring, mesh erosion/extrusion, and intense vaginal pain on the bottom and right side of her vagina." *Id.*

Nora reports that Magdeline Karon, M.D., treated her in Lexington, Kentucky, from 2010 to 2015.  Karon diagnosed Nora with vaginal vault prolapse, stage 3; SUI; and lateral cystocele.  [Record No. 19-2, p. 4]  On January 30, 2015, Karon performed reparative surgery, using a Burch urethropexy procedure to treat the SUI.

At the time Nora completed her "Plaintiff Fact Sheet," she alleged continuing vaginal pain and dyspareunia.  [Record No. 19-4, p. 4]  She reported that she was not aware that her symptoms were related to a defect in the TVT-S until around January 2015 when she saw an advertisement on television "relating to the complications associated with transvaginal placement of surgical mesh to treat pelvic organ prolapse and stress urinary incontinence." *Id.* at p. 3.

### III.    Standard of Review

"Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Saunders v. Ford Motor Co.*, 879 F.3d 742, 748 (6th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  The moving party initially bears the burden of "pointing out" that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the movant meets the initial burden, the opposing party must set forth specific facts showing that there is a

---

[1]    Dr. Beiting explained that dyspareunia is painful sexual intercourse.  [Record No. 17-1, p. 21]

genuine issue for trial." *McLaughlin v. Fifth Third Bank, Inc.*, 772 F. App'x 300, 302 (6th Cir. 2019) (citing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court views all evidence in the light most favorable to the nonmoving party. *McLaughlin*, 772 F. App'x at 302 (citing *Anderson*, 477 U.S. at 252).

## IV.    Discussion

### A.    Partial Motion for Summary Judgment

The defendants have moved for summary judgment with respect to counts I (to the extent the plaintiffs assert a claim for manufacturing defect and failure to warn), II, III, IV, VI, VII, VIII, IX, XI, XII, XIII, XIV (to the extent the plaintiffs assert a claim for manufacturing defect and failure to warn), and XV. The plaintiffs indicate that they oppose the defendants' motion only with respect to count I (negligence—failure to warn) and count III (strict liability—failure to warn).[2] [*See* Record No. 20, p. 3.] As a result, the defendants' motion for summary judgment will be granted with respect to the unopposed issues.

---

[2]     The plaintiffs also list the individual claims for which they do not oppose granting summary judgment and do not include Count XI—breach of express warranty. However, in their later-filed response to the defendants' motion to dismiss the Amended Complaint, the plaintiffs report that they do not intend to proceed with the breach of express warranty claim. Additionally, the plaintiffs did not articulate any argument in response to the defendants' motion for summary judgment with respect to that claim. Accordingly, summary judgment will be granted with respect to the claim for breach of express warranty. *See Wimbush v. Wyeth*, 619 F.3d 632, 636 (6th Cir. 2010) ("When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate.").

The parties agree that Kentucky substantive products liability law applies in this action. That is appropriate, since the plaintiffs are citizens of Kentucky, the TVT-S was implanted in Kentucky, and plaintiff apparently has received all SUI-related care in Kentucky. Accordingly, Kentucky law applies in this case. *See Wilton Corp v. Ashland Castings Corp.*, 188 F.3d 670, 673 n.2 (6th Cir. 1999) (observing that there is no need to engage in a choice-of-law analysis when the parties agree on the applicable substantive law). *See also Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 736 (W.D. Ky. 2014) (citing *NovadxVentures, Corp. v. Gress Eng'g, P.C.*, Civil No. 12-78-GFVT, 2013 WL 794375, at *2 (E.D. Ky. Mar. 4, 2013) (noting that Kentucky has a strong preference for applying its law in tort actions and, if there are significant contacts with Kentucky, its law should apply)).

To survive a motion for summary judgment under either a strict liability or negligence theory, the plaintiffs must provide evidence that (1) the defendants failed to provide Dr. Beiting with adequate warnings about the risks of TVT-S and (2) that the inadequate warnings proximately caused their injuries. *See Estate of DeMoss v. Eli Lilly and Co.*, 234 F. Supp. 3d 873, 880 (W.D. Ky. 2017); *Primal Vantage Co., Inc. v. O'Bryan*, 2018-CA-045, 2018-CA-063, 2018-CA-106, 2019 WL 6044870, at *11 (Ky. Ct. App. Nov. 15, 2019) (discussing failure-to-warn under negligence and strict liability theories). *See also Clark v. Danek Med., Inc.*, No. 3:94CV-634, 1999 WL 613316, at *4 (W.D. Ky. Mar. 29, 1999) (quoting *Snowder v. Cohen*, 749 F. Supp. 1473, 1476 (W.D. Ky. 1990) ("theories of negligence and strict liability in failure to warn cases have been deemed to be functional equivalents").

This test reflects Kentucky's adoption of the learned intermediary rule when it comes to prescription drugs and medical devices.  This is an exception to the rule that a manufacturer's duty to warn of risks inherent in the product runs to the ultimate consumer.

- 8 -

*See Mcgaha v. C.R. Bard, Inc.*, No. 1:19-CV-020, 2019 WL 8889948, at *4-5 (W.D. Ky. Oct.

4, 2019) (discussing *Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 770 (Ky. 2004)). Here, the

"manufacturer's duty to warn is discharged if it warns a learned intermediary of risks that were

either known or knowable considering the state of medical knowledge available at the time of

manufacture and distribution." *Prather v. Abbott Labs.*, 960 F. Supp. 2d 700, 709 (W.D. Ky.

2013).

The plaintiffs rely on the opinions of expert Bruce Rosenzweig, M.D., in an attempt to

establish that the defendants did not fulfill their duty to warn in this case. Specifically, the

plaintiffs cite the following conclusions from Rosenzweig's report:

> Ethicon's warnings and disclosures of adverse events in its TVT-S Instructions
> for Use ("IFU") have been inadequate based on the adverse reactions and risks
> associated with the TVT-S that have been known to Ethicon from the time the
> TVT (the TVT-S' predicate device and foundation for the TVT-S' IFU) was
> first sold and marketed.

> Ethicon did not disclose information to physicians in its IFUs regarding
> characteristics of the old construction mesh (Prolene) that makes it unsuitable
> for its intended application as a permanent prosthetic implant for stress urinary
> incontinence, including that it is too rigid, small pore, heavyweight mesh, it
> degrades over time, and cases chronic foreign body reactions, fibrotic bridging,
> and mesh contracture/shrinkage.

> The foreseeable risks of harm mentioned above could have been reduced or
> avoided by providing reasonable instructions or warnings as set forth in my prior
> report.

> Ethicon did not inform physicians and patients that Material Safety Data Sheets
> ("MSDS") for polypropylene resin used to manufacture polypropylene meshes
> warned against use of the mesh in a permanently implanted device as it is
> incompatible with peroxides and that studies showed that it caused sarcomas in
> laboratory rats.

> Ethicon did not properly inform physicians that toxicity testing of the
> polypropylene mesh revealed that it was cytotoxic.

- 9 -

> Ethicon's promotional materials sent to physicians related to the TVT-S were inaccurate and failed to reveal information promoted in the materials about complications/risks and conflict of interests regarding data.
>
> Ethicon's collection and reporting of adverse events and complications to physicians and patients is misleading, inaccurate, and incomplete.

[Record No. 20, pp. 6-7]

An expert's opinions must be "supported by good grounds, based on what is known." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).  Here, the plaintiffs attached only a brief excerpt of Rosenzweig's report in response to the defendants' motion for summary judgment, and did not provide *any* information explaining the factual bases for Rosenzweig's conclusions.[3]  These unadorned conclusions, without more, would not be admissible at trial and therefore cannot be considered at the summary judgment stage.  *See McGuire v. Mich. Dept. of Comm. Health*, 526 F. App'x 494, 496 (6th Cir. 2013) (party opposing summary judgment need not provide evidence in admissible form, but content of evidence must be admissible); Fed. R. Civ. P. 56(e) ("[s]upporting and opposing affidavits shall be made on personal knowledge, *shall set forth such facts as would be admissible in evidence*, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). The opinions, without more, are insufficient to create a genuine issue of material fact indicating that the defendants' warnings for the TVT-S were inadequate.[4]

---

[3]    It is possible that Rosenzweig's report is buried somewhere in the parties' joint designation of record but, if so, it is not labeled as such in the docket.  Since the plaintiffs did not identify it, the Court did not consider it.  *See Wimbush*, 619 F.3d 632, 641 (6th Cir. 2010) (party opposing summary judgment has burden of pointing to evidence creating a factual dispute in a particularized manner).

[4]    The parties advised the Court on May 1, 2020, that various *Daubert* challenges remain unresolved with respect to certain expert witnesses, including Rosenzweig.  However, the parties did not identify the nature of the remaining issues to be resolved and indicated that the defendants'

The plaintiffs also have failed to come forward with sufficient evidence indicating that a deficient warning was the proximate cause of their harm.  Under Kentucky law, proximate cause is defined by the substantial factor test.  In other words, was the defendants' conduct a substantial factor in bringing about the plaintiffs' harm?  *Morales v. Am. Honda Motor Co., Inc.*, 71 F.3d 531, 537 (6th Cir. 1995).  Ethicon's motion for summary judgment focuses exclusively on the plaintiffs' lack of evidence of causation, arguing that there is no evidence indicating that "additional information or an adequate warning would have changed [Nora's] physician's prescribing decision."  [Record No. 18, p. 4 (citing *Clark v. Danek Med., Inc.*, No. 3:94CV-634-H, 1999 WL 613316, at *6 (W.D. Ky. Mar. 29, 1999)].

While it does not appear that any Kentucky court has issued a bright-line rule for causation in this scenario, many others have required the plaintiff to produce evidence that an additional warning would have changed the treating physician's prescribing decision.  *See e.g., Tutwiler v. Sandoz, Inc*., 726 F. App'x 753 (11th Cir. 2018) (applying Alabama law); *Lewis v. Johnson & Johnson*, 601 F. App'x 205 (4th Cir. 2015) (applying Texas law); *Rodriguez v. Stryker Corp.*, 680 F.3d 568 (6th Cir. 2012) (applying Tennessee law); *McElroy v. Eli Lilly & Co.*, 495 F. App'x 166 (2d Cir. 2012) (applying Nebraska law).  *See also Clark*, 1999 WL 613316, at *6 (pre-*Larkin* case applying Kentucky law; indicating patient-plaintiff could establish causation by showing that he would have decided against the operation after hearing additional warnings).

---

motion for summary judgment should be immediately submitted to the Court for resolution. Accordingly, for the purposes of this motion, the Court assumes that the parties do not dispute the admissibility of these particular opinions.

The plaintiffs did not respond to this argument, other than to say that knowing additional risks regarding the TVT-S "would have been important" to Dr. Beiting. While the plaintiffs do not explicitly state what form the additional warnings should have taken, their expert, Bruce Rosenzweig, M.D., opined that the warnings given in the IFU were inadequate. Beiting testified during her deposition that she did not recall reviewing the IFU prior to Nora's surgery and did not rely on it to learn the risks associated with the procedure. [Record No. 17-1, p. 16] Likewise, she did not rely on or learn of the risks from Ethicon sales representatives. *Id.* at pp. 18, 38-39. Instead, she learned the potential complications associated with TVT implantation during her medical education a decade prior to Nora's surgery. [Record No. 17-1, p. 15] Accordingly, there is no evidence that additional warnings in the IFU would have caused Dr. Beiting not to use the TVT-S in Nora's surgery.

Additionally, Beiting testified that she stands by her decision to use the TVT-S in Nora's surgery. *Id.* at p. 55. According to Beiting, the TVT-S came onto the market in 2006. It was made of the same prolene mesh material as other TVT devices, but it was smaller and required a less invasive implantation procedure. Beiting explained that she believed the mesh was safe and effective as a surgical implant because she had used it for a long period of time and had good outcomes for her patients. *Id.* at p. 27. She also testified that such slings had been studied extensively and "the studies seem[ed] to be very encouraging that they're highly effective as well as safe." *Id.*

At the time of Nora's surgery, Beiting was aware of other treatment options for SUI, including the Burch procedure, which "takes an abdominal approach to urethral support." *Id.* at p. 16. The Burch procedure requires the physician to make an abdominal incision and attach tissue near the urethra to a ligament on the pelvic brim with a permanent suture. *Id.* This

- 12 -

procedure carries a risk of urinary retention, hematomas, nerve injury, recurrence of SUI, injury to internal organs, infections, and risk of prolapse.  Beiting used this procedure less frequently than TVT because it was more difficult to perform and patients generally tolerated TVT better.  *Id.* at pp. 16-17.

Mid-urethral slings using TVT also were an option, but implanting them required a more invasive procedure than the TVT-S, such as going through the obturator membrane, which presented an increased risk of leg pain or nerve injury.  *Id.* at p. 17.  Beiting explained that, at the time, the TVT-S was often used for older, less active, patients who had SUI but also were undergoing prolapse repair.  According to Beiting, the TVT-S provided sufficient support to improve these patients' incontinence but was without some of the risks that the other slings could have caused.

Eventually, mid-urethral slings became the standard of care for the treatment of SUI and Dr. Beiting stopped using the TVT-S.  She stated that her decision to stop using the product was not because the product was unsafe.  *Id.* at p. 40.  According to Beiting, "It was safe. . . . It was more about data supporting other procedures that had longer or better long-term benefits."  *Id.*  At the time of her deposition, Beiting believed that TVT-S was the least invasive procedure, with the least risk of complications, available for Nora's complaints at the time of her surgery.  *Id.* 55.[5]

---

[5]     The plaintiffs' attorney asked Beiting several hypothetical questions such as whether her decision to use TVT-S would have been influenced by knowledge that "surgeons who had implanted hundreds of TVT-Ss and TVT-Os were experiencing failure rates between 30 and 50 percent with the TVT-S in 2007."  [Record No. 17-1, p. 45]  Beiting indicated that she would have taken such information into consideration in deciding whether to use the TVT-S.  However, the plaintiffs have failed to identify any evidence indicating that the hypothetical questions were based in fact.  Accordingly, the plaintiffs have not shown why Beiting's answers to these questions are relevant to her decision to use the TVT-S in Nora's surgery.

Nora stated in her deposition that she probably would not have consented to surgery if Beiting had advised her beforehand that there was a risk of permanent pain with intercourse, chronic urinary problems, and chronic pelvic pain. [Record No. 19-7, pp. 3-4] *Id.* However, the underlying premise of the learned intermediary doctrine is that the patient "plac[es] primary reliance upon the physician's judgment, and [follows] his advice and instructions as to use of the [device]." *In re Meridia Prods. Liability* Litigation, 328 F. Supp. 2d 791, 811 (N.D. Ohio 2004) (quoting *Seley v. G.D. Searle & Co.*, 423 N.E.2d 831 (Ohio 1981)).

Beiting testified repeatedly that she warned Nora of the various complications of mesh surgery, including discomfort, urinary problems, dyspareunia, vaginal scarring, mesh erosion/extrusions, vaginal pain, vaginal bleeding, or other complications such as infection, medical complications, and even death. [*Compare* Record Nos. 17-1, pp. 20-22; 41-42 *and* 19-2, p. 2 *with* 19-4, p. 3.] Beiting's documentation indicates that Nora agreed and consented to the procedure and the accompanying risks. [Record No. 19-2, p. 2] The plaintiffs have not provided any specific testimony from Nora contradicting Beiting's statements. Nora's vague testimony that she "probably would not" have had surgery had she received stronger warnings is insufficient to create a jury issue on causation.

Based on the foregoing, the plaintiffs have not come forward with sufficient evidence from which a jury could conclude that the defendants' warning regarding the TVT-S was deficient or that a deficient warning caused the plaintiffs' alleged harm. Accordingly, the defendants' motion for partial summary judgment will be granted.

## B.    Motion to Dismiss

The defendants have filed a motion to dismiss the plaintiffs' Amended Complaint for failure to comply with Rule 8(a) of the Federal Rules of Civil Procedure. Specifically, the

defendants argue that the plaintiffs' tendered Short Form Complaint, which was approved by the MDL court, lacks specificity such that the defendants cannot form an Answer that complies with Rule 8(b). Accordingly, the defendants contend, the plaintiffs should be required to file an amended complaint that includes detailed factual allegations that are sufficient to comply with Rule 8(a).

The plaintiffs will not be required to tender an additional amended complaint. The Court required the plaintiffs to file the Amended Complaint of May 18, 2020, solely to correct deficient allegations with respect to subject matter jurisdiction. This litigation has been pending since 2015, during which time extensive discovery has been conducted and motions for summary judgment have been filed. In other words, the defendants do not purport to have insufficient notice of the plaintiffs' claims.

The defendants contend that they cannot form an Answer that complies with Rule 8(b). This problem is easily resolved. The problem of insufficient jurisdictional allegations has arisen in other cases transferred from the pelvic mesh MDL. There, the plaintiffs were permitted to tender a Jurisdictional Statement establishing subject matter jurisdiction rather than filing an Amended Complaint. *See, e.g., Burton, et al. v. Ethicon Inc., et al.*, Lexington Civil Action No. 5: 20-280-DCR. This approach allows the plaintiffs to correct the deficiency in their Complaint but eliminates the filing of unnecessary pleadings at this late juncture in the proceedings. Accordingly, the Amended Complaint will be converted to a Jurisdictional Statement and no responsive pleading is required.

The defendants also complain that the Amended Complaint includes 12 claims that the plaintiffs stated were waived in response to the defendants' motion for summary judgment. The plaintiffs report that, although they were included in the Amended Complaint, they do not

intend to proceed on Counts II, IV, VI, VII, VIII, IX, X, XI, XII, XII, XIV, and XV.  Because the plaintiffs have agreed that summary judgment may be granted in the defendants' favor with respect to these claims, the motion to dismiss is moot.

## V.      Conclusion

Based on the foregoing, it is hereby

**ORDERED** as follows:

1.      The defendants' motion for partial summary judgment [Record No. 17] is **GRANTED**.  Plaintiffs' claims under Count I (manufacturing defect and failure to warn); Count II (strict liability-manufacturing defect); Count III (strict liability-failure to warn); Count IV (strict liability-defective product); Count VI (common law fraud); Count VII (fraudulent concealment); Count VIII (constructive fraud); Count IX (negligent misrepresentation); Count XI (breach of express warranty); Count XII (breach of implied warranty); Count XIII (violation of consumer protection laws); Count XIV (manufacturing defect and failure to warn); and Count XV (unjust enrichment) are **DISMISSED**, with prejudice.

2.      The defendant's motion to dismiss the Amended Complaint [Record No. 64] is **DENIED**, as moot.

3.      The Amended Complaint, filed on May 18, 2020 is **CONSTRUED** as a Jurisdictional Statement.   The Clerk of the Court is directed to **STRIKE** "Amended Complaint" from the docket text at Record No. 63 and recharacterize the filing as a "Jurisdictional Statement."

4.      **On or before Friday, August 21, 2020**, the parties shall file a joint status report identifying the 1) claims that remain pending for trial and 2) the outstanding *Daubert* issues

that require resolution.  The parties shall clearly indicate which claims relate to Plaintiff Nora Mitchell and which claims relate to Plaintiff Arthur Mitchell.  When identifying *Daubert* issues, the parties are directed to cite to the joint designation of record by using the applicable docket entries, exhibits, and page numbers that the Court should consider in deciding the outstanding motions.  Failure to do so may result in waiver of issues not properly cited.

Dated: August 6, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky